UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

RAYMOND TORRES,

    Petitioner,

v.                                   Case No: 8:18-cv-1116-WFJ-TGW

SECRETARY, FLORIDA
DEPARTMENT OF CORRECTIONS,

    Respondent.
_____/

## ORDER DENYING PETITION FOR HABEAS RELIEF

    Petitioner Raymond Torres is serving two concurrent prison sentences. He is serving a life (20-year minimum) sentence for second degree murder, concurrent with a 15-year sentence for shooting into a building. He was sentenced in 2010 in the Thirteenth Judicial Circuit of Florida (Hillsborough County) after adverse jury verdicts in a short trial. He brings this petition for habeas corpus relief under 28 U.S.C. § 2254. After careful review of the record, materials presented, and written submissions, the Court denies the petition.

### *FACTUAL BACKGROUND:*

    A "bottle club" is an after-hours establishment that avoids liquor license regulations as to "closing time" by permitting attendees to purchase mixers but bring their own alcohol. Petitioner and friends were attending the Groovy Mule

Bottle Club on Dale Mabry Highway in Tampa, in the early morning of January 20, 2008. A fight broke out with Petitioner and his friends fighting other patrons. The fight started over a female, Ms. Gonzalez, who was the co-defendant's girlfriend at the time. Ex. 1e at 652, 658, 663, 667.[1] Ms. Gonzalez testified Petitioner started the fight and it involved about 30 people. *Id*. at 658. Apparently, Petitioner got the worst of the affray, and was bleeding, with a swollen eye, "busted lip," and his "faced got messed up." Ex. 1e at 672–673; Ex. 1f 690–691. After the fight broke up, Petitioner and his friends, in his words, "were put in their SUV and asked to leave" the bottle club. Doc. 1 at 4.

After Petitioner and his friends were ejected from the bottle club, about 30 to 40 minutes later at roughly 6:00 a.m. a minivan drove by the bottle club, and those in the van shot at the club through an adjacent parking lot. The Groovy Mule, which opened at 3:00 a.m., Doc. 1 at 9, was still open at the time. A patron sitting in his car was shot in the head, fatally, with the bullet consistent with one fired from a .357 revolver. Doc. 13 at 65; Ex. 9a at 52–53. Petitioner was convicted as one of the shooters.

An acquaintance of Petitioner, Tony Harris, testified at trial that Petitioner told the Harris about the fight over a girl at the bottle club where they got

---

[1] The underlying trial and appellate record is found on the electronic docket at entry 9 and is comprised of Exhibits, cited hereafter as Ex. __ at __.

2

"jumped." Petitioner was "bruised like he had been beat on." Ex. 1f at 714. And Petitioner said he and his friend (a co-defendant convicted separately) drove back to the club in the friend's van and they shot at the bottle club with Petitioner firing a .357 magnum pistol and the co-defendant firing an assault rifle. Doc. 1 at 5; Ex. 1f at 717-722. This witness testified that after the drive-by shooting, Petitioner and he stashed the revolver and assault rifle under the witness' couch cushions. *Id.* This witness then threw the guns in the Hillsborough River and later told the police where they were located. The police retrieved them and matched the pistol to projectiles removed from a building in the line of fire near the parking lot and also to the bullet in the decedent's head. Doc. 1 at 5; Doc. 13 at 66.

The female from the fight, Ms. Gonzalez, testified that they all went to her boyfriend's (the co-defendant's) apartment after the fight, and she saw Petitioner and the co-defendant leaving in what she believed to be a minivan, prior to the drive-by shooting. Ex. 1e 660–661, 667–669. She claims to have seen the co-defendant with a gun then. Doc. 1 at 4; Ex. 1e at 661, 670–671. She testified that prior to leaving in the minivan, Petitioner and his colleagues were angry and "loud, mad." Ex. 1e at 659. A third witness testified that after ejectment from the club the witness, Petitioner, and the co-defendant who went with Petitioner in the minivan, talked about "getting them" at the club. This witness saw the co-defendant with a rifle. Doc. 1 at 4.

3

Petitioner's paramour and mother of his children, Ms. Johnson, testified that on that morning she noticed missed phone calls from Petitioner. Ex. 1f at 689. Petitioner left a voicemail that sounded scared, stating that he did something wrong, and needed her to come get him. Ex. 1f at 689–690. She called Petitioner back and he admitted that he got injured in a fight at the Groovy Mule and left, then returned to the Mule and exchanged fire. *See* Doc. 13 at 25; Ex. 1f at 690–691. This witness was subject to trial impeachment due to drug usage, and alleged favor and threats from the authorities. Ex. 1f at 696–704.

Petitioner's co-defendant, Max Jasper, was charged identically as Petitioner. He went to jury trial in a severed case a month before Petitioner. He was convicted of the same charges as Petitioner.[2]

**GROUND ONE:** [3]

In Ground One Petitioner contends that his conviction for second degree murder should be reversed with instructions to reduce it to third degree, because there was no proof that he was aware of anyone in the parking lot at the time the state witnesses allege he shot into it. Doc. 1 at 5. As a preliminary matter the

---

[2] *See* www.dc.state.fl.us/OffenderSearch/Search.aspx?TypeSearch=Al (last consulted April 7, 2021).

[3] Respondent makes a case that the petition is time-barred unless Petitioner can demonstrate the applicability of equitable tolling, *see Holland v. Florida*, 560 U.S. 631, 645 (2010), or his actual innocence, *see McQuillan v. Perkins*, 569 U.S. 383, 386 (2013). Dkt. 8 at 9–11. Petitioner alleges no equitable grounds. Even assuming the petition timely, it is without merit as set forth in this order.

Court notes that although this issue was brought on direct appeal, it was couched as a state law evidentiary issue, relating to Florida classification of degrees of murder and state evidence sufficiency issues.[4] The plain and unadorned federal constitutional point was not squarely and sufficiently presented in the state direct appeal below. "[I]t is not the province of a federal habeas court to examine state-court determinations on state-law questions." *Estelle v. McGuire,* 502 U.S. 62, 67–68 (1991).

In any event, if one granted Petitioner the doubt here[5] and considered this matter exhausted, it founders on the merits. Under the United States Constitution, a claim of insufficient evidence in a federal habeas proceeding requires understandable deference to the jury, who heard and weighed all the evidence and its inferences. Congress has sought "to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone,* 535 U.S. 685, 693 (2002). The state court's handling of this issue must result in a decision contrary to, or an unreasonable application of, clearly established federal law. The only exception to this is a decision based on unreasonable determination of facts in light of the evidence presented in the state

---

[4] On direct appeal, the state appellate court affirmed his conviction and sentence. *Torres v. State*, 69 So. 3d 287 (Fla. 2d DCA 2011).
[5] The reference to the federal constitutional standard for sufficiency *was* made to the state appellate court in Petitioner's writ of habeas corpus based on ineffective assistance of appellate counsel, but very perfunctorily. *See, e.g.* Doc. 13 at 35.

proceeding. 28 U.S.C. §2254(d)(1)-(2). In such a situation Petitioner must rebut the presumption of factual correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

This Court "may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." *Jackson v. Virginia*, 443 U.S. 307 (1979). The facts at trial show Petitioner was ejected from a late night drinking spot after a fight, and his group vowed to "get them." He and his colleague armed themselves, drove by the still-open bar, Ex. 9d at 721, in a plan to attack it, and shot it up indiscriminately with high-powered weaponry. Then Petitioner hid the guns. He confessed to these acts to at least two persons, including admitting returning to the bar where he "exchanged fire." Based on his admissions and the .38 bullet excavated from the decedent's brain, Petitioner fired the death strike. A rational jury could convict Petitioner of this crime: He certainly perpetrated "an act imminently dangerous to another and evincing a depraved mind regardless of human life, although without any premediated design to effect the death of any particular individual." Fla. Stat. § 782.04(2) (defining second degree murder). The United States Constitution requires no more.

## **_GROUNDS TWO THROUGH SIX:_**

In Grounds Two through Six, Petitioner brings sundry ineffective assistance of counsel claims. The Court need not repeat here the very familiar standards of *Strickland v. Washington,* 466 U.S. 668, 687 (1984). Suffice it to say, Petitioner must first establish a performance so deficient that counsel was not functioning as a lawyer guaranteed by the Sixth Amendment. *Id.* at 687. Second, he must prove a reasonable probability that but for this defalcation the result of the proceeding would have been different. *Id.* at 694. A defendant is entitled to reasonable counsel, not error-free counsel. *Lancaster v. Newsome,* 880 F.2d 362, 375 (11th Cir. 1989). In adjudicating this matter, "it is not enough to convince a federal habeas court that, in its independent judgment, the state court applied *Strickland* incorrectly. Rather, [Petitioner] must show that the [state court] applied *Strickland* to the facts of his case in an objectively unreasonable manner." *Cox v. Donnelly,* 387 F.3d 193, 197 (2d Cir. 2004), citing *Bell v. Cone,* 535 U.S. 685 (2002).

***GROUND TWO:***

Petitioner states that his trial lawyer was ineffective by misleading him as to the prosecutor's ability to cross-examine him about the details of his prior convictions. Petitioner contends he was misled to believe that if he testified the prosecutor could inquire into the specific details of those priors, thus impeaching him about them. This kept Petitioner off the stand, he argues, and denied him that

7

key trial right of testifying on his own behalf. Petitioner also argues this prohibited him from putting on an alibi defense or contradicting State witnesses. Doc. 1 at 7.

In rebuttal the Respondent argues, first, that Petitioner's decision not to take the stand in his defense was addressed on the record at trial, in a colloquy with the trial judge. In that colloquy with the trial judge, Ex. 1f at 756-759, Petitioner stated under oath that he had discussed the matter thoroughly with his lawyer, did not need more time to talk to his lawyer, and freely waived his right to take the stand.

Respondent also argues that this matter was brought before the post-conviction court upon review, and Petitioner's trial lawyer testified at the ensuing evidentiary hearing. The trial lawyer rebutted Petitioner's Ground Two entirely. *See* Ex. 9e at 1311–1315. The trial lawyer testified that he did not advise his clients in the manner Petitioner stated, erroneously telling the client that the State could inquire as to the specific, underlying details of prior convictions. Further, Petitioner told this trial lawyer at the time that Petitioner had no alibi. *Id.* at 1313–1315.

Petitioner also testified at the post-conviction evidentiary hearing. *See id.* at 1035–1037. Petitioner was concerned at trial because his prior record included an attempted murder charge from Michigan in 1998, a later battery on law

8

enforcement conviction in violation of Fla. Stat. § 784.03, and a drug possession charge in violation of Fla. Stat. § 893.13. Ex. 9a at 42. Petitioner contended that trial counsel led him erroneously to believe that the details of the priors could be inquired of upon cross-examination. And the factual similarity of his prior record to the Groovy Mule shooting led Petitioner to avoid testifying. Ex. 9e at 1035–1037.

The post-conviction court found that the lawyer's testimony was more credible and accepted it. The court found no ineffectiveness in the way Petitioner was advised about his trial testimony; thus, the first prong of *Strickland* was not met. *Id.* This finding of the trial court upon collateral review is neither an unreasonable application of the law not an unreasonable finding of fact. Ground Two is denied.

### GROUND THREE:

In this ground Petitioner claims his trial lawyer was ineffective for failing to investigate and call as witnesses his father, mother, and cousin. These persons could have established his alibi and placed him at home during the time of the shooting. They could have contradicted what Petitioner argues is a weak and shaky case based on oral witness, and not physical, testimony. Doc. 1 at 8–9. In effect, these three witnesses could have established Petitioner's alibi, that he was at home preparing to attend work with his father when the shooting occurred.

9

The state circuit court, upon collateral review, held an evidentiary hearing on this ground. The first fault in the ground is, as discussed above, that the trial lawyer testified Petitioner told him Petitioner had no alibi, and that was reflected in the trial lawyer's dated, contemporaneous notes. Ex. 9e at 1149–1152; 1164–1165 ("my client told me he had no alibi"). In fact, the Petitioner "shifted several times" in what he told his lawyers as to the facts. *Id.* at 1147. The circuit judge credited this lawyer's testimony, a finding of fact that is not unreasonable based upon this record and which Petitioner has not rebutted.

Petitioner's mother passed away a year before his trial, Ex. 9e at 1137, 1286, so assertions about her are irrelevant. The trial lawyer testified he was never made aware of the cousin. *Id.* at 1165. The father and cousin testified at the post-conviction hearing. Their testimony illustrated why defense counsel did not offer them as alibi witnesses. They both stated Petitioner had returned home, preparing for work, by 5:00 a.m., which was well before the fight at the bottle club, which both sides agreed the bruised and bloody Petitioner had attended. Ex. 9e at 1136, 1195–1196. The alibi they might have offered failed for other reasons illustrated at the post-conviction hearing.[6] Specifically, the post-conviction court found that the

---

[6] At the risk of getting into too much detail: The father and cousin defeated the alibi by their clear mistakes in time. The alibi defense Petitioner sought to show at the evidentiary hearing suffered from other real flaws. At about 6:15 a.m. there was a police disturbance call at the co-defendant's apartment, and Petitioner was noted present. That required Petitioner to explain, implausibly, how he could have been with the co-defendant at the fight (roughly 5:35 a.m.) but

cousin's testimony was uncertain and did not appear grounded in actual recollection of the events. Ex. 9e at 1042. The state court's denial of relief on this ground was not an unreasonable application of law or improper consideration of the facts.

### GROUND FOUR:

Ground Four criticizes a failure to investigate the ex-paramour who testified to Petitioner's telephonic confession the morning of the shooting. Petitioner contends that defense counsel should have subpoenaed phone records, which would show the inculpatory calls never happened. Moreover, trial counsel allegedly failed to disclose to the jury that the ex-paramour received favorable treatment from authorities for her testimony. Doc. 1 at 11.

The defense lawyer deposed the paramour before trial. Ex. 9e at 1149. It does appear that a large number of phone records were provided to the defense

---

home preparing for work with his father at 6:00 a.m. (when the shooting happened, Ex. 9e at 1233–1244) but then the co-defendant for some unknown reason came to the father's house and picked him up at 6:05 am  so he was back at the co-defendant's apartment about 6:15 am (for the police encounter), and then immediately back home so his father could pick him up in a work truck and they both could attend work. Ex. 9e at 1108–1128. In addition, during this time span Petitioner attended the 7-Eleven store (when the co-defendant was on video committing an armed robbery). Petitioner also contended that within this timeframe he alone then visited a RaceTrac filling station where opponents from the fight were present and challenged him. (Case discovery mentioned a RaceTrac video showing some—not Petitioner—from the fight gathered there after the fight, at the time of the shooting.) The proffered alibi simply could not bear this conflicting weight and appeared contrived to get Petitioner away from the co-defendant at the time of the 6:00 a.m. shooting but immediately back with the co-defendant for the police encounter at about 6:15 a.m. The inability of this alibi to cohere might have been why Petitioner told his lawyer he had no alibi.

11

before trial.  Ex. 9e at 1028.  The trial counsel made the decision as to approach to take to cross-examine the paramour and he determined that phone records were not necessary.  *Id.* at 1316, 1045.  The defense lawyer conducted a workmanlike cross-examination of this witness, who stated her phone was unavailable as it fell into the commode.  Ex. 1e at 568–577.  Her biases were apparent in this cross.  The post-conviction court concluded that this ground was speculative, as Petitioner made no effort to obtain those phone records to illustrate his point that they would have helped impeach the witness.

The Court agrees with Respondent that based upon the trial lawyer's testimony, the adequate cross-examination of the ex-paramour which did show her biases, and the failure of Petitioner to bear his burden of proof as to these records, the state court appropriately denied relief on this ground, or was not unreasonable in doing so or in derogation of clearly established Supreme Court precedent.  No prejudice was shown of the impact required under *Strickland*.

## GROUND FIVE:

The penultimate ground asserts that trial counsel was ineffective for failing to obtain surveillance videos from various businesses in the relevant area during the times surrounding the shooting.  Doc. 1 at 13.  The post-conviction court's order outlined this issue well.  Ex. 9e at 1046–1048.  The prime tape that Petitioner complains about is one from the 7-Eleven store, where Petitioner attended after the

fight. Also present was the armed co-defendant, who was videotaped jumping over the counter and robbing the store of a carton of cigarettes. Both Petitioner and the co-defendant smoked the same cigarette brand. Ex. 9b at 710. At the evidentiary hearing the trial lawyer testified that he had indeed reviewed this tape, and it put Petitioner in the company of the co-defendant/shooter (whom witnesses had testified bore the rifle) near the time of the shooting. Ex. 9e at 1050. The minivan from which the shots were fired can be seen in the tape. *Id*. Also, playing the tape could show the armed robbery by the co-defendant with Petitioner nearby. Exs. 9 at 61; 9e at 1049–1050, 1164–1168, 1185; 1317–1318. The post-conviction court quite properly found that the non-use of this videotape was a reasonable, indeed wise, defense tactic.

    Petitioner also contends that there was tape from the co-defendant's apartment and from the RaceTrac gas station that should have been played. Petitioner alluded to these tapes but failed to produce them at the hearing to show they were exculpatory. There is no indication in this record that any tape from the co-defendant's apartment exists.

    As to the RaceTrac tape, this was tied into Petitioner's very weak and problematic alibi defense, *see* pages 7–9 and footnote 6 of this order, and the only evidence in this record is that Petitioner was not on this tape. Others who fought Petitioner at the bar were on the RaceTrac premises tape at the time of the

13

shooting, thus exonerating them from the shooting. Ex. 1c at 351–356. Petitioner did not obtain this RaceTrac tape or try to obtain the tape for the hearing. There is no evidence it was exculpatory and no indication it even existed at the time of the post-conviction hearing. Based on the trial transcript, defense counsel's testimony about his strategy and adequate trial presentation, and given only speculation offered by Petitioner at the hearing, Ex. 9e at 1046–1052, as to the tapes and the entire lack of real prejudice, the state court did not commit an unreasonable application of federal law in denying relief after a hearing.

### ***GROUND SIX:***

In the final ground Petitioner complains of insufficient and lax cross-examination of Tony Harris, the acquaintance. This is the witness to whom Petitioner confessed while they stashed the guns in Harris' couch. Petitioner states the plan to aggressively cross-examine Harris and pin the shooting on him was an agreed-upon defense strategy that trial counsel abandoned. According to the petition "counsel and Petitioner agreed that the focus of the trial strategy to be employed was that Tony Harris, in fact, committed this crime and lied constantly [in the earlier co-defendant shooter trial] to cover up his own involvement." Doc. 1 at 17.

In effect, Petitioner contends that cross-examination of Harris was weak. Ground Six states that Harris did admit before Petitioner's jury that he told lies in

prior statements to assist the co-defendant in his earlier trial. But "the specific of these lies were not elicited allowing a misrepresentation of the facts necessary for the jury to consider when evaluating the credibility of the State's man [sic] witness [Harris]." *Id*. Petitioner argues that "[c]ounsel did not lay a factual foundation through aggressive cross examination and impeachment to advance the viable defense theory that Tony Harris has lied from the beginning to cover up his own involvement. Defense counsel also did not advance this viable defense theory throughout his closing argument as agreed upon prior to trial." *Id*. In addition to poorly setting the stage that witness Harris might have been the shooter, Petitioner also asserts trial counsel failed to impeached Harris on his dislike of Petitioner and his affinity for the co-shooter who was convicted in an earlier trial.

In other words, the plan to lay the blame on Harris was not carried out by trial counsel with sufficient aggression. Petitioner asserts this was a "viable defense theory."

This claim was addressed, and "aired out" at the post-conviction evidentiary hearing. Trial counsel testified that the defense at trial was Petitioner was not involved in the shooting. Counsel viewed the theory that Harris was involved as lacking evidentiary support. *See* Ex. 9e at 1297, 1301, 1315, 1326. Good lawyers know that arguing about non-facts is like arguing about air.

Moreover, Harris' dislike of Petitioner and the impeachment of Harris based on prior inconsistent statements to assist the co-defendant did come out clearly at trial. *Id.* at 1300–1301, 1325–1326; Ex. 1f at 731–743 (counsel gets Harris to admit to prior sworn false statements to help co-defendant). The jury also heard clearly that Harris considered the co-defendant his "brother" but did not care much for Petitioner. *Id.*

The post-conviction court found that Petitioner had failed to show any constitutional insufficiency in counsel' performance in this regard, nor was prejudice established. Ex. 93 at 1029. The undersigned has read the trial transcript and the post-conviction court hearing transcript. The post-conviction court's conclusions are not an unreasonable application of the law and are consistent with a fair reading of the facts. No doubt Petitioner wishes his trial lawyer had been better or somehow there could be more to pin on Harris. In the real world of trial work, though, one can only work with what the facts present. Harris was not present at the bar for the fight; he was not bloody and vowing revenge. The evidence of Harris as the shooter was thin on this record. Trial counsel handled Harris adequately with what he had to work with, exceeding *Strickland's* minimum.

The petition (Dkt. 1) is denied and the Clerk is directed to enter judgment for Respondent and close the file.

The petition neither presents a reasonable argument suggesting denial of a federal constitutional right nor makes any substantial showing of such denial. 28 U.S.C. § 2253(c)(2). Reasonable jurists would not disagree. *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing 28 U.S.C. § 2253(c)); *Eagle v. Linahan*, 279 F.3d 926, 935 (11th Cir. 2001). Accordingly, the Court does not provide a certificate of appealability. No grounds, therefore, exist for proceeding further *in forma pauperis* because any appeal would not be taken in good faith.

**DONE AND ORDERED** at Tampa, Florida, on April 7, 2021.

_____
WILLIAM F. JUNG
UNITED STATES DISTRICT JUDGE

**COPIES FURNISHED TO**:
Counsel of record and Petitioner, *pro se*